No. 2462.
Second Circuit

---

JOHN R. CHAPMAN v. LOUISIANA CENTRAL LUMBER COMPANY AND OUACHITA & NORTHWESTERN RAILROAD COMPANY.

---

(February 8, 1926. Opinion and Decree.)
(March 11, 1926. Rehearing Refused.)

---

(*Syllabus by the Editor*)

1. **Louisiana Digest—Master and Servant —Par. 160 (a).**

If it is necessary for the injured employee suing under the Workmen's Compensation Law Act No. 20 of 1914 to undergo considerable pain while exercising his injured arm in order to recover sufficiently to do the work he was accustomed to, his refraining from doing the work which would cause this pain will not be considered unreasonable, nor will it debar him from compensation under the Workmen's Compensation Act.

Appeal from Eighth Judicial District Court of Louisiana, parish of Caldwell, Hon. F. E. Jones, Judge.

This is a suit for compensation under the Louisiana Workmen's Compensation Law Act No. 20 of 1914 and in the alternative under the Federal Liability Act, but the alternative demand has not been pressed.

There was judgment in favor of one defendant, the railroad company, but plaintiff did not appeal this judgment. There was judgment in favor of plaintiff against the lumber company and defendant appealed. Plaintiff moved to increase the judgment. Judgment affirmed.

Long and Crow and Geo. T. McSween of Shreveport, attorneys for plaintiff, appellee.

Thornton, Gist and Richie of Alexandria, attorneys for defendant, appellant.

REYNOLDS, J. This is a suit against the Louisiana Central Lumber Company for compensation under the workmen's compensation act (Act 20 of 1914 as amended by Act 216 of 1924).

The claim under the Louisiana compensation law was presented as an alternative demand for $25,000.00 under the Federal employers' liability act, this demand being against both the Louisiana Central Lumber Company and the Ouachita & Northwestern Railroad Company.

Judgment having gone in favor of the railroad company, and plaintiff not having appealed, we need not consider the claim against that company.

The District Judge held that as to the Louisiana Central Lumber Company the applicable law was the state, and not the federal statute. We agree with this view and do not understand plaintiff's counsel seriously to contest it.

On September 18, 1924, plaintiff was thrown from a motor car and suffered an oblique fracture of his left collar bone two or three inches from the top of the shoulder. Good union was effected in healing, but the parts overlapped about an inch, with consequent shortening of the collar bone and slight forward tilt of the shoulder.

These conditions are permanent.

At the time of the trial, May 12, 1925, there was atrophy and flabbiness of the muscles of the left arm, which was about an inch smaller than the right arm.

The plaintiff is right-handed.

The District Judge allowed $9.75 a week for 17 weeks for total disability, $3.90 a week for partial disability, during such disability, but not exceeding 283 weeks, and $27.00 for medical expenses; subject to a credit of $100.00 paid by defendant.

Defendant appealed. It does not complain of the allowance for total disability, but claims that the District Judge erred in allowing the other two items.

Plaintiff moved to amend the judgment by increasing the allowance for partial disability from $3.90 a week to $8.00 or $8.50 a week.

### I.

Defendant pleads that plaintiff had fully recovered in December, long before seventeen weeks after the time of the accident, but the testimony fully satisfies us that he was still partially disabled at the time of the trial, more than twenty-eight weeks after the accident.

Defendant's chief defense is that plaintiff's present disability is due, not to the injury, but to his wrongful refusal to use his arm, which use, it claims, would have restored him to normal ability to do any work of a reasonable character.

Counsel for defendant, in brief, say:

"If it had not been for the possibility of getting compensation, this plaintiff would have been back to work within a period of four to six weeks after the accident."

They cite no authorities on the question thus posed.

In some of the state compensation laws it is expressly provided that compensation will not be paid for disability, so far as it is caused, continued or aggravated by an unreasonable refusal to submit to medical or surgical treatment.

See "Workmen's Compensation Acts", a Corpus Juris treatise, by Donald J. Kiser, issued by the American Law Book Company, paragraph 62, page 71.

This author further states:

"Further it has been held, in the absence of provision in the statute, that a continuing disability due to the wilful or unreasonable refusal of the claimant to submit himself to safe and simple surgical treatment is not proximately caused by the accident.

"But although the statute requires the employer to furnish medical services, the employee by refusing such service does not forfeit his right to compensation unless such refusal is unreasonable or wilful."

In the same work, paragraph 94, page 98, we find the following:

"The question of whether a result due to failure of the employee to avail himself of proper medical or surgical treatment may be said to flow from the primary injury, has already been considered. Apart from this, in determining the amount of compensation, a condition cannot be taken as a basis which may readily be alleviated, as by a safe and not extraordinarily painful surgical operation which offers a reasonable prospect of relief; but the employee is not to be compelled to submit to a dangerous operation. Notwithstanding the possibility of such subsequent amelioration of the injury by an operation to which the employee is not required to submit, the court should, in awarding compensation, make the award in accordance with the facts, as they exist at the time of the award. Refusal of the employee to undergo a reasonable surgical operation may be urged by an application to review or terminate the compensation."

Under each of these statements various authorities are cited.

Dr. Stafford, a witness for defendant, testified that he examined plaintiff March 17, 1925; that he found no disability to do ordinary manual labor, except that owing to flabbiness of muscles of the left arm it was not capable at that time of performing full function as far as manual

labor was concerned; that he attributed this to lack of use of the arm; that the atrophy usually and necessarily follows as a result of an accident of the kind in question; that to get full function it is necessary to use the arm all the patient possibly can; that he advised plaintiff to do this; that he thinks three or four months ample time for the arm to recover with proper exercise; that if plaintiff had begun exercising the muscles properly at the expiration of the time he was necessarily disabled plaintiff would, he thought, have been able to perform ordinary manual labor at the time witness examined him; that at the time he examined plaintiff he expressed the opinion that with proper use of the muscles he should be able to perform his full capacity of work within two months; that there was no reason why he should not begin doing manual labor at that time; that he could have done it, but the arm would have been somewhat weak for a period of about two months, by which time if he had continued to work he would have gotten maximum use.

Dr. Rand testified for defendant that he did not see how the slight overlapping could affect plaintiff's ability to do manual labor; that the injury would disable plaintiff a maximum of about three months from the time it occurred; that he did not examine the man very carefully in March, but that injuries of a similar nature in other individuals considered plaintiff ought to have been able to do work at that time; that there was nothing with reference to the injury that would prevent him from working at that time; that in practically all oblique fractures of the collar bone there is a certain amount of overlapping; that this is a common condition which ordinarily produces no disturbance of function and one to which no particular attention was paid until the X-ray began to be used; that following any fracture there is atrophy of the muscles if the patient does not show a disposition to use the member; that in his opinion atrophy was due entirely to disuse; that with reasonable exercise the condition would improve and the arm get back to normal; that the time for its doing this would be extended somewhat due to the fact that following injuries near the joint there is some pain when the patient first uses the arm, and, as plaintiff's arm has not been used, the return to normal condition of the muscles will possibly be delayed, the time dependent on how much work he actually does, certainly a matter of a few weeks; that, assuming that his job was that of a section foreman, whose principal work was to ride a handcar and stand around and direct the men, witness saw no reason why he should not do this at the time of the trial as well as before the accident.

Dr. Richardson, testifying for defendant, said that he first examined plaintiff about four weeks after the injury; that the bones had completely united at that time; that he examined him every once in a while until about December; that the atrophy was accounted for partly by the fact that the plaintiff was right-handed and partly by non-use of the arm; that he examined plaintiff on the day of the trial; that overlapping is not out of the ordinary in oblique fractures, it being almost impossible to retain the proper position of the shoulder long enough for the bones to unite with perfect adjustment; that the plaintiff would have to gradually use the arm, but would finally get to where he would practically have normal use of it again; that by "practical" he means it would be as good as is usually gotten from a broken bone; that a fracture of the collar bone

is not a serious injury; that plaintiff should be able to do manual labor in three months after the injury; that from experience with that kind of injury it is usually from five to six months or seven months after the injury before the injured person regains normal use of the arm, or say two or three months after he begins exercising the arm; that if he never begins to exercise it he never gets full use of it; that plaintiff's injury interferes with his striking and lifting powers for the time; that plaintiff's condition causes the muscles over the shoulder to be in a strained position until they get accustomed to the tautness which necessarily keeps them in a peculiar position; that a fracture of the clavicle with overlapping is always permanent; that there is impairment of the function of the shoulder and left arm, and, like broken bones in other parts of the body, has never gotten back to where it was before the breaking; that for all practical purposes plaintiff has as good an arm as ever; that the condition of the arm should bind when he lifts his arm; that the interference with his labor by the sticking in the flesh would finally be very slight; that the percentage of plaintiff's impairment is about twenty-five; that eventually he will reach the stage where it will not interfere with doing manual labor; that plaintiff complained of a pain reaching over the front part of the shoulder when he raised his arm, and that naturally there would be some pain: stretching atrophied muscles will cause pain.

Dr. Stafford, it will be noted, was not asked about the feature of pain, and said nothing about it. Dr. Rand was not asked, either, but stated that there was some pain when the patient first used the arm after the injury.

Plaintiff was not a section foreman, but a section hand.

Dr. Adair testified for plaintiff, but merely described the break, its complete union, with overlapping and shortening, and that he did not consider the result good, as overlapping in ordinary cases is not expected any more.

Dr. Sanderson, after describing the condition of the arm and clavicle, which was not disputed, on being asked what the atrophy indicated, replied:

"Well, it might indicate one of two things; it might indicate disuse following the injury, and the fact that he has probably not exercised the arm since the injury, that might account for it. It might have to be accounted for by the pressure on some nerves that go into the arm, which are beneath the clavicle."

He further says that he does not know whether disuse or the difference in the use of the two arms accounted for all the difference he found, and asked if the condition was one he would expect to impair the use of that side and arm, he replied:

"Well, a good deal depends upon just what degree, cause some impairment, regardless of the pressure, where a fracture overrides on the clavicle, it is perhaps against or causes some pressure on the nerves of the arm."

He further said that the injury was of such a nature as would make the man less able to use that arm and side; that he did not consider plaintiff permanently disabled from doing reasonable manual labor; that where the clavicle is fractured if good results are obtained and the patient gets back to work and uses that hand as much as the other normal tone should be regained within a year; that when the injured man first goes back to work he will necessarily suffer some pain from the use of the arm; that if he did not use the arm to do manual labor he

would be keeping the arm from regaining normal muscle strength; that a man timid about using an arm that pained him would be harder to get back to normal than one not afraid to use it; that plaintiff's condition was the usual one where the patient had made up his mind not to use the arm; that usually those so injured could do about the same things they could do before in the way of handling themselves; that since discovery of the X-ray overlapping is less frequent than before; that there is no way of telling how much nerve pressure there is except from the patient's own feeling; but that if the nerve pressure is severe there is marked atrophy; that in plaintiff's case there is rather marked atrophy.

Plaintiff testifies:

"Q.   Since you received this injury have you been able to do any work of any kind?
"A.   Why, no, sir. I have tried to work; it hurts underneath my arm; so I work a little while and my arm hurts all the time.
"Q.   Do you know what is the matter with your arm at this time?
"A.   Well, I know it is injured from that hurt. It hasn't got any strength in it as it should have.

*          *          *          *          *

"Q.   Explain to the court how that pain affects you?
"A.   Well, it burns right in there (indicating) just like it was from the sun, and something seems to be sticking in there whenever I get my arm up like that (indicating). It's that way all the time, and if I go to pull on anything, why, it hurts.
"Q.   Are you able to place your arm in any kind of position you want to?
"A.   No, sir.
"Q.   To what extent are you limited to the use of your arm?
"A.   I can lift it up like that (indicating).
"Q.   You can't raise your arm to the level of your shoulder?
"A.   I can with my other hand.

"Q.   I mean with its own volition?
"A.   No, sir.
"Q.   Do you suffer any pain from this?
"A.   Yes, sir, like I do in the day time. Whenever I turn over on my left side that sticking insinuation hurts and wakes me up."

On cross-examination plaintiff testified that after Dr. Richardson told him to take the banages off he tried to do little piddling jobs, such as hoeing and thinks like that; that he hoed about a day and a half for his brother-in-law, Ainsworth, for which he got paid about 75 cents a day; that the only other work he had done was to help saw stove wood, to help a boy saw stove wood; that he was a widower, 41 years of age, with two children, one of whom was at his sister's and one at a cousin's, and that he had not applied for or tried to hold a position.

He further says that he received from defendant on account of compensation for the injury the following sums: $17.50, $57.25, $15.00, and $18.20, making $107.95. Of this, $15.00 was to pay the expenses of a trip to Alexandria to see a doctor on the request of defendant, and $27.00 he paid to a physician of his own selection. This would leave him, to be applied on living expenses, $65.95, from the date of the injury, September 28, 1924, up to the time of the trial, May 12, 1925. At $9.75 per week, the largest amount he could possibly claim, this $107.95 would be compensation up to about January 1, 1925.

It is not shown whether plaintiff is a man of means or not, but we think it would not be a violent presumption to presume that he is not a man of much means.

Defendant ceased paying plaintiff compensation some time in December; so at the time of the trial he had not been drawing any compensation for about four months and a half.

Defendant took a suspensive appeal from a judgment which allowed full compensation for seventeen weeks or, say, until about February 1st, and only $3.90 a week during disability after that time, but not exceeding 300 weeks, and this subject to a credit of $100.00.

The history of jurisprudence makes us aware that sometimes claimants pretend to injuries they have not received or exaggerate those actually received. Naturally, though, this is more common where the prize is a large lump sum to be realized soon after the trial and without the necessity of keeping up the pretence after the trial.

Defendants in this class of cases often charge, and perhaps it is sometimes true, that similar false pretences are made by persons claiming compensation. Where they are actually receiving considerable compensation there is no doubt strong temptation to malinger. Where they are not receiving compensation, though, the proof should be strong indeed to convince us that a plaintiff is deliberately refraining from earning money which he could earn and doubtless needs for his support when the object to be attained is not a considerable lump sum by keeping up the pretence for a relatively short time, but is merely a small weekly allowance terminable or reducible on proof of changed condition, thereby necessitating continuance of pretence indefinitely.

It has been pointed out that our statute contains no provision for denying compensation ·where the disability is due to an unreasonable refusal of workmen to take medical treatment.

Conceding, without deciding, that, as held in some jurisdictions, the court should deny compensation in such cases, on the theory that in those cases the disability is not due to the injury, but to the plaintiff's own wrongful conduct, it should be quite clear under the evidence that the refusal to follow medical advice is unreasonable to justify us in applying the doctrine.

We have seen from the above quotation from Corpus Juris that in those jurisdictions applying this doctrine, the burden is on the defendant to establish the un-. reasonableness of the refusal.

"Notwithstanding the possibility of a subsequent amelioration of the injury by an operation to which the employee is not required to submit, the court should, in awarding compensation, make the award in accordance with the facts as they exist at the time of the award."

In support of this text is cited the case of Feldman vs. Braunstein, 67 N. J. L. 20, 93 A. 679; and of the proposition:

"Refusal of the employee to undergo a reasonable surgical operation may be urged by an application to review or terminate compensation"—

is cited Krickinovich vs. American Car, etc., Co. (Mich.), 159 N.W. 362, and O'Neill vs. Ropner, 2 BWCC. 334.

In this case we cannot say that plaintiff's non-use of his arm is unreasonable. We are satisfied that the mere hope of obtaining a small weekly compensation which at most he could obtain would not be sufficient inducement to make him continue deliberately to refrain from work and earning a living. It may be true, as the doctors testify, that he could regain the use of his arm by exercising it, but if exercising it is so painful that he re-

frained from such exercise, though at the cost of privation and of a continuance of his disability, which naturally he would wish terminated, even though he might want that termination concealed from defendant, we cannot say that the refusal to exercise it is so unreasonable as to deprive him of the right to compensation.

As shown above, some of the doctors make no mention of the pain, and others, while they do not, of course, corroborate plaintiff as to the fact that he does have pain, yet they do corroborate him to the extent of showing that his condition would be likely to cause him pain.

The court cannot know the extent of this pain and does not consider that it has the right to tell the plaintiff that he shall undergo it or lose his compensation when he prefers, much as he must desire to regain his ability to work, to stand a continuance of his disability rather than to undergo the pain.

Under all the facts in the case, we think the judgment of the lower court is right.

Defendant bitterly complains of the allowance of the $27.00 medical bill.

Plaintiff, with a broken shoulder, never refused treatment tendered him by the lumber company. He went to Dr. Holloman, who gave him a couple of tablets, several bottles of linament and two boxes of antiflogistine, but he did not place the shoulder. Under the circumstances, plaintiff called in Dr. Hamilton, who set his arm. His bill for this service was $27.00. We think the services were clearly medical services, for which the defendant is responsible.

For the above reasons, the judgment of the lower court is affirmed.